# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1110

_____

United States of America,        *

                                *

        Appellee,          *

                                *   Appeal from the United States

      v.                       *   District Court for the

                                *   Western District of Missouri.

Charles E. Winston,        *

                                *

        Appellant.       *

_____

Submitted: June 12, 2006
Filed: August 4, 2006

_____

Before SMITH, HEANEY, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Charles E. Winston was convicted by a jury of conspiracy to possess with intent to distribute cocaine base ("crack cocaine"), in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(a). The district court[1] sentenced Winston to 262 months' imprisonment and ordered the entire sentence to run consecutively to the state murder sentence Winston was serving in Kansas. Winston appeals, arguing that insufficient evidence supports the jury's guilty verdict and that the sentence imposed is

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

unreasonable because the district court should have ordered it to run concurrently with his Kansas sentence. We affirm.

## I. *Background*

Winston and his codefendant, Chatha M. Tatum[2], were wanted on homicide charges in the State of Kansas. A Federal Bureau of Investigation (FBI) Task Force obtained information that Tatum was located in a house at 2745 Rayton Road, Kansas City, Missouri. After receiving the information, law enforcement officers surrounded the house and, following a short stand-off, arrested Winston and Tatum, along with the occupant of the house, Charles Howell.

Law enforcement officers subsequently searched the home, recovering drugs, firearms, ammunition, and drug paraphernalia. From the toilet tank in the bathroom of the master bedroom, officers recovered (1) a plastic baggie containing 28.09 grams of cocaine; (2) a plastic baggie containing 18.64 grams of marijuana; (3) a 9mm Hewan semi-automatic pistol; and (4) five rounds of 9mm ammunition.

The officers also recovered (1) a plastic baggie containing 261.72 grams of crack cocaine and (2) a .45 caliber Glock semi-automatic handgun with clip and ammunition from a child's backpack located in the closet of the master bedroom. In the pocket of an orange coat hanging in the master bedroom closet, the officers discovered a plastic baggie containing 15.94 grams of marijuana.

In addition, the officers recovered (1) a digital scale from a pile of clothes in the master bedroom; (2) an assault rifle from a utility closet in the garage; (3) a magazine and ammunition for the assault rifle from the toilet tank of the guest

---

[2]Tatum was also charged with conspiracy to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(a). Tatum, however, pleaded guilty to the charges.

bathroom; and (4) a plastic baggie containing 6.03 grams of marijuana from a cabinet in the guest bathroom.

During his interview with the police following his arrest, Winston stated that he went to Howell's house only to purchase marijuana and that he was merely acquainted with Tatum. However, the government's witnesses testified that Winston's affiliation with Tatum exceeded that of a casual companion, as they were both fugitives from justice, eluding arrest from charges out of the State of Kansas.

Howell testified at Winston's trial that Winston telephoned him looking for some marijuana. Howell advised Winston that he had some marijuana to sell, instructing Winston to come to his house to get it. According to Howell, Winston arrived at the house with Tatum an hour later. Howell was unaware that Tatum would be accompanying Winston. When Howell answered the door, he noticed Tatum standing behind Winston, carrying a child's backpack. While Howell knew Tatum, he knew Winston better. Howell testified that Tatum's presence made him uncomfortable.

Howell testified that he invited Winston and Tatum into his home and offered Winston the marijuana he requested. Winston, however, was looking for "Indo," a higher quality marijuana. Howell pretended to telephone someone to get Indo and told Winston that no one was available to get the marijuana he desired. Howell stated that he was not comfortable arranging a deal for the higher quality marijuana with Tatum present.

After Howell advised Winston that he could not supply him with the marijuana, Tatum asked Howell, in Winston's presence, if Howell was selling crack cocaine. Tatum told Howell that he had "touched down," meaning that he had just obtained a large amount of crack cocaine. Howell testified that he understood the conversation to mean that Tatum was looking for someone to sell some or all of this crack for him.

Howell declined the offer, however, stating that he had a pending criminal matter and did not want to get into any more trouble. The child's backpack was either in Tatum's hand or by the side of the couch where Tatum was sitting during the conversation.

Following the conversation, Winston and Tatum stayed at the house waiting for their ride. Howell went back to the master bedroom to play a video game. After finishing the video game, Howell went back into the living room to check on Winston and Tatum. He then returned to his bedroom.

Forty-five minutes into Tatum and Winston's visit to Howell's home, the police arrived. When Howell heard a helicopter and observed the police outside of his house, he told Winston and Tatum of the police's presence, ran back to the bedroom to retrieve the assault rifle, and hid the rifle in the utility closet in the garage. Howell then ran back to the master bedroom where he retrieved the magazine for the assault rifle and placed it in the guest bathroom's toilet tank. When Howell was moving the assault rifle, he observed Tatum running around the house. Howell also observed Winston in the bathroom of the master bedroom standing over a toilet disposing of a white powdery substance in a small clear plastic baggie, which Howell believed to be crack cocaine. During the subsequent search of the house, officers retrieved a plastic baggie containing 18 grams of crack cocaine from this toilet tank.

Meanwhile, outside the house, the police were yelling for Tatum, but Tatum was still running around the interior of the house. Winston told Tatum to surrender, and Tatum went outside where he was arrested. Winston and Howell were arrested in the interior of the house without incident.

Howell admitted owning the assault rifle, the digital scale, and some of the marijuana found during the search. Some of the contraband the police recovered was forwarded to the police crime laboratory for DNA testing. The plastic baggie from the toilet tank in the bathroom of the master bedroom containing 18.64 grams of

marijuana was tested, but there was not enough DNA to compare. Winston's DNA was identified on the 9mm handgun found in the toilet tank next to the baggie of crack cocaine located in the master bathroom; however, DNA from five or more other individuals was also found on the gun. The plastic baggie containing 261.72 grams of crack cocaine from the child's backpack was tested, but there was not enough DNA to compare. Tatum's DNA, however, was identified on clothing recovered from the child's backpack. The .45 caliber Glock semi-automatic pistol, with clip and ammunition, from the child's backpack was tested and had DNA from multiple individuals on it, but not Winston's DNA. The plastic baggie containing 6.03 grams of marijuana was tested, but no conclusion could be reached as to whether it was Winston's DNA. Finally, the assault rifle was tested and had DNA from multiple individuals, including Winston.

The jury found Winston guilty of conspiring to possess with intent to distribute 50 grams or more of crack cocaine. At sentencing, the district court determined Winston's advisory Guidelines range to be 262 to 327 months' imprisonment. Winston argued for a sentence below the Guidelines range and asked the court to impose the sentence concurrent to the sentence he was serving in the State of Kansas for murder.

The district court sentenced Winston to 262 months, the low end of the Guidelines range. The court also denied Winston's request to run the sentence concurrent with the sentence Winston was serving for murder in the State of Kansas.[3]

---

[3]Prior to imposing the sentence, the district court made the following statement:

Mr. Winston's history really is not very encouraging. At the age of 20, he's already in a Criminal History Category of IV and among his convictions are the conviction for first degree murder, attempted first degree murder in Wyandotte County (Kansas).

The nature and circumstances of the offense is probably reflected in both the mandatory minimum sentence and the guideline range. Mr. Brown

## II. *Discussion*

Winston raises two arguments on appeal. First, he argues that insufficient evidence supports his conviction for conspiracy to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(a). Second,

---

(Winston's attorney) believed that the disparity between the powder cocaine and the crack cocaine was wrong. I'm not sure there's a basis for any differentiation between the two, but nevertheless, it is the policy of this country as announced through Congress that this is the sentencing range for this offense.

I am to consider the need of the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and provide just punishment, to afford an adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. As with Mr. Tatum, I think that's a very important factor in this case.

And then the sentence should reflect the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. And as we all know, for 17 or 18 years people who were convicted of this offense were sentenced under the guidelines because the guidelines were mandatory.

Having said all of that, it's my view that the range set out in the guidelines is a reasonable range, and it's my intent to sentence within the guideline range.

Further, the request that this sentence be made concurrent or partially concurrent with the Kansas sentence will be denied. The offense that resulted in his Kansas sentence was an offense committed against the people of the State of Kansas. The offense that he is in court for this morning is an offense committed against the people of the United States. Each has its own punishment, and it's my belief that the punishment should be imposed by each jurisdiction respectively.

he argues that his sentence is unreasonable because the district court ordered his sentence to run consecutive to rather than concurrent with his state murder sentence.

## A. *Sufficiency of the Evidence*

As to the sufficiency of the evidence, Winston contends that: (1) no evidence exists that he knew Tatum's backpack contained crack cocaine or that he knew Tatum was trying to sell crack cocaine prior to Tatum's conversation with Howell; (2) Howell and Tatum never reached an agreement to sell crack cocaine, and he never participated in the conversation or discussed the possession or distribution of crack cocaine with Howell or Tatum; (3) no evidence in the record identified the substance Howell saw Winston flushing down the toilet or its origin; (4) no evidence exists that he had an agreement with anyone, including Tatum, to possess with intent to distribute crack cocaine; and (5) evidence of his mere association with Tatum and his mere presence during the conversation between Howell and Tatum is insufficient to show an agreement, his knowledge of an agreement, or his knowing joinder and participation in an agreement to possess with intent to distribute crack cocaine.

We review de novo a district court's denial of a motion for judgment of acquittal. *United States v. Howard*, 413 F.3d 861, 863 (8th Cir. 2005). In reviewing the sufficiency of the evidence, we view the "evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Littrell*, 439 F.3d 875, 880 (8th Cir. 2006) (citation omitted). This is an extremely strict standard of review. *United States v. Alexander*, 408 F.3d 1003, 1008 (8th Cir. 2005).

"To convict [a defendant] of conspiracy, the government need[s] to prove [the defendant] (1) had an agreement to achieve an illegal purpose, (2) knew of the agreement, and (3) knowingly became part of the agreement." *United States v. Johnson*, 439 F.3d 947, 954 (8th Cir. 2006). Direct evidence of an explicit agreement

is not necessary to prove a conspiracy; instead, "a 'tacit understanding' among co-conspirators may be, and often will be, inferred from circumstantial evidence." *Id.* "In many conspiracy cases there is no confession by the defendant or other direct proof that he agreed to the illegal act. However, the jury is free to consider all the evidence—direct and indirect—presented of the defendant's statements and actions." *United States v. Wilson*, 103 F.3d 1402, 1406 (8th Cir. 1997). In addition, the jury may "draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence." *Id.* at 1407.

We recently "clarif[ied] the proper standard of review for challenges to the sufficiency of the evidence in conspiracy cases." *United States v. Lopez*, 443 F.3d 1026, 1028 (8th Cir. 2006) (en banc). While acknowledging our previous statements that "slight evidence" is sufficient to connect a defendant to a conspiracy, in *Lopez*, we clarified that "while a defendant's role in a conspiracy may be minor, the government must offer enough evidence to prove a defendant's connection to a conspiracy beyond a reasonable doubt before the conspiracy conviction can be upheld." *Id.*

In a conspiracy case, evidence of association or acquaintance is a relevant factor but alone is insufficient to establish a conspiracy. *Alexander*, 408 F.3d at 1008. Likewise, "a defendant's mere presence, coupled with knowledge that someone else who is present intends to sell drugs, is insufficient to establish membership in a conspiracy." *United States v. Shoffner*, 71 F.3d 1429, 1434 (8th Cir. 1995).

As to conspiracy, the first question we must address is whether Winston had an agreement to achieve an illegal purpose, i.e., to possess crack cocaine with an intent to distribute it. Because the facts do not show Howell and Tatum entered an explicit agreement to sell crack cocaine, we must determine whether circumstantial evidence establishes that Winston and Tatum made a tacit agreement to do so.

Viewing the facts in the light most favorable to the jury's verdict, we hold that a jury could reasonably find that such an agreement existed.

The jury in this case heard evidence that sufficiently linked Tatum and Winston's association to drugs. First, the government presented evidence that they were both fugitives from justice, eluding arrest from charges out of the State of Kansas. Second, the jury heard evidence that Winston initiated contact with Howell, calling him and asking him if he could purchase marijuana from Howell. Third, Howell testified that Winston came to his house with Tatum, someone he did not know very well, who was carrying a child's backpack, which the jury later learned contained crack cocaine and a handgun. The jury could have reasonably inferred that because Howell was not expecting Tatum and was not well-acquainted with him, Winston agreed to drive Tatum to Howell's residence, knowing that Tatum wanted to speak with Howell about selling drugs. *See United States v. Sparks*, 949 F.2d 1023 (8th Cir. 1991) (noting evidence that co-defendants arrived at a house in the same car and conferred before approaching the house "indicated that they cooperated in their journey to the house" and helped support their conspiracy convictions). Fourth, after Winston brought Tatum to Howell's residence, he was present during the conversation in which Tatum proposed that Howell sell the crack cocaine for him. The jury could reasonably have linked Winston's presence during the conversation with his prior conduct of driving Tatum to Howell's house, inferring that Winston knew what was in Tatum's backpack. Fifth, Winston was not merely present during the attempted drug transaction between Tatum and Howell. Howell saw Winston dumping a white powdery substance into the toilet. The jury later learned that crack cocaine was found in this toilet, along with a gun containing Winston's fingerprints.

The second and third inquiries in the conspiracy analysis are whether Winston knew of the agreement and whether he knowingly became a part of the agreement. To establish these elements, the government presented evidence that Winston dumped a white powdery substance, later discovered to be crack cocaine, down the toilet when

the police arrived. The jury could reasonably infer from Winston's actions that Winston would not have taken possession of the crack cocaine and disposed of it if he had no knowledge of its whereabouts in the child's backpack and had no interest in it. The jury could reasonably find based on his actions that he was part of the agreement.

Therefore, viewing the evidence in the light most favorable to the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict we hold that the district court did not err in denying Winston's motion for judgment of acquittal.

B. *Reasonableness of the Sentence*

Winston's second argument is that the district court should have ordered his sentence to run concurrent with or partially concurrent with the sentence he is serving in the State of Kansas. In response, the government argues that, before imposing Winston's sentence, the district court carefully considered the factors set forth in 18 U.S.C. § 3553(a) and in § 5G1.3(c) of the United States Sentencing Guidelines Manual ("U.S.S.G.") and found that a consecutive sentence was necessary to protect the public, to deter future crimes, to avoid unwarranted sentencing disparities, and to impose punishment for separate crimes in separate jurisdictions.

We review a district court's decision to impose a consecutive or concurrent sentence for reasonableness. *See United States v. Shafer*, 438 F.3d 1225, 1227 (8th Cir. 2006) ("[W]e must review the district court's decision to impose a concurrent sentence for reasonableness."). The district court must explain its reasoning for imposing a concurrent or consecutive sentence "[f]or this court to properly carry out the appellate review mandated by *Booker* . . . ." *Id*.

The advisory Guidelines discuss consecutive and concurrent sentences. *Id*. "When the defendant is subject to an undischarged term of imprisonment for an

unrelated crime, 'the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment.'" *Id.* (quoting U.S.S.G. § 5G1.3(c) (policy statement)). To determine whether to impose a consecutive or concurrent sentence, the district court "'shall consider . . . the factors set forth in section 3553(a).'" *Id.* (quoting 18 U.S.C. § 3584(b)) (alteration in original). Consideration of these factors aids the district court in "achiev[ing] a reasonable incremental punishment for the instant offense and avoid[ing] unwarranted disparity . . . ." Application Note 3(A) to U.S.S.G. § 5G1.3. "When prison terms for multiple offenses are imposed at different times, the governing statute encourages consecutive sentencing." *Shafer*, 438 F.3d at 1227.

For example, in *United States v. Atteberry*, 447 F.3d 562 (8th Cir. 2006), we rejected the defendant's argument that "the district court abused its discretion under § 5G1.3(c) by imposing a consecutive rather than a concurrent federal sentence." *Id.* at 564. Because the district court explained that the defendant's state and federal convictions were separate, that the defendant "need[ed] something on the end of the state [sentence] for what he pled guilty to here," and that the "total combined sentence was appropriate," we held that "[g]iven the nature and severity of [the defendant's] crimes," the district court's imposition of a consecutive sentence was reasonable. *Id.* at 564–65.

As in *Atteberry*, the district court explained, citing the § 3553(a) factors, why it was imposing a consecutive sentence as opposed to a concurrent sentence. The district court noted Winston's substantial criminal history; indicated that the nature and circumstances of the offense were reflected in the mandatory minimum sentence and the Guideline range; gave particular weight to the consideration that the sentence imposed reflect the seriousness of the offense and protect the public from further crimes of Winston; noted, as to the need for the sentence to avoid unwarranted sentencing disparities among defendants, that similarly situated defendants had

received similar sentences; and decided to impose a consecutive sentence because Winston's murder conviction was an offense against the people of the State of Kansas, while his conspiracy conviction was an offense against the people of the United States.

Based on the district court's thorough discussion of the § 3553(a) factors, we hold that the district court did not err in imposing a consecutive sentence and that its sentence of 262 months' imprisonment was not unreasonable.

Accordingly, we affirm the judgment of the district court.

_____